Butler, J.
Plaintiff, Charles W. White (White) brings this action against the defendants, the Boston Phoenix, Inc., and its agents, David Samuels, William Risteen and Barry Morris (collectively “the Phoenix”) alleging that the Phoenix wrongfully interfered with White’s development and promotion of a commercial telephone service providing current information about nightclubs (Club Line).[2] White contends that the Phoenix’s interference with the promotion and development of the Club Line constituted a violation of G.L.c. 93A, §11 (Count I); intentional interference with contractual relations (Counts VI, VIII, XI, XIII); and intentional infliction of emotional distress (Counts VII, IX, X, XII). The Phoenix now moves for summary judgment pursuant to Mass.R.Civ.P. 56.
BACKGROUND
For the purposes of this motion the undisputed material facts are as follows;
Prior to February 1992, White developed the idea to promote a telephone informational service which would inform the general public of upcoming entertainment and music events at nightclubs in the Boston area. A similar concept, not originated by White, was in use in the New York City area prior to February 1992. To make his idea profitable, White established a phone service in which local nightclubs could buy advertisement time on the Club Line and incoming calls from the general public would be free.
Seeking corporate sponsorship, White contacted Stephanie Kusmer (Kusmer), an agent of August Busch Company, which promotes Anheuser Busch products. White was given assurances from Kusmer that his idea would be kept confidential. After some meetings with Busch representatives, Kusmer informed White on February 14, 1992, that Busch would not sponsor the Club Line.
On February 18, 1992, White submitted the proposal to the Boston Herald newspaper asking the Herald to support the Club Line. The Herald accepted the proposal and on April 10, 1992, it began publishing an advertisement for the Boston Herald Club Line in its newspaper. The telephone number for prospective patrons to call was 1-800-CLUB-911.
Anne Marie Carnes (Carnes), the owner of Club III in Somerville, subscribed to the Boston Herald Club Line on a week-to-week basis to advertise her nightclub. During her participation in the Boston Herald Club Line, Carnes requested that the Phoenix newspaper list the Club Line number in an ad she had placed with the Phoenix.[3]
*346 initially, the Phoenix agreed to her request to print the number with her ad. Later that same day, the Phoenix informed Carnes that it would not advertise the number. A meeting occurred at Phoenix headquarters on April 23, 1992, between the Phoenix agents and several local nightclub owners, including Carnes, to discuss the ads the Phoenix would not publish. Carnes attended the meeting with other Boston area nightclub owners. The Phoenix was adamant about not publishing the Boston Herald Club Line number in its paper. (Carnes’s deposition, p. 11.) When the meeting concluded, members of the Phoenix escorted Carnes to a computer room capable of providing the Phoenix customers with a nightclub hotline service. During the tour, Carnes became aware that the Phoenix received funds from Budweiser that could be spent on such a phone line. (Carnes’s deposition, p. 12-13.)
For approximately two weeks after the meeting with the Phoenix agents, Carnes continued to advertise with the Herald Club Line. She also continued to advertise her club in the Phoenix newspaper. Shortly thereafter, Carnes informed White she no longer wished to advertise through the Herald Club Line because the Club Line was not meeting her needs. (Carnes’s deposition, p. 14.) Her needs were not being met by the Boston Herald Club Line because the advertisements were wrong and the club listings were a week behind.[4] (Carnes’s deposition, p. 14.)
Bunratty’s, another area nightclub, also subscribed to plaintiffs and the Herald’s telephone service. According to the affidavit of Bunratty’s booking agent, Christopher Porter, he also requested that the phone service number be listed in Bunratty’s ad appearing in the Phoenix. An agent of the Phoenix informed him that she did not think she could include the phone service’s number in Bunratty’s Phoenix advertisement. The ad which ran did not include the Herald’s Club Line service number.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving parly bears the burden of affirmatively demonstrating the absence of a triable issue, “and [further] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); accord, Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “If the moving party establishes the absence of triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion.” Pederson, supra, 404 Mass. at 17. “[T]he opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment.” LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
Any affidavit submitted to defeat a summary judgment motion must be based on personal knowledge. Whirty v. Lynch, 27 Mass.App.Ct. 498, 500 (1989). Facts asserted within an affidavit will only be considered if such facts would constitute admissible evidence. Malapanis v. Shirazi, 21 Mass.App.Ct. 378, 385 n. 7 (1986). Hearsay statements within an affidavit are unacceptable for purposes of a summary judgment motion and will not be considered by the court. McKenzie v. Brigham & Women’s Hosp., 405 Mass. 432, 437-38 (1989). The court may not consider portions of affidavits containing conclusory statements, or statements of belief. Key Capital Corp. v. M&S Liquidating, 11 Mass.App.Ct. 721, 727-28 (1989); Malapanis, supraat 385, n. 7. Thus, the court has considered only the facts in the affidavits submitted that are based on the affiant’s personal knowledge.[5]
I. Violation of G.L.c. 93A, §11 (Count I).
White asserts that the conduct of the Phoenix and its agents in this matter constitutes unfair and deceptive business practices and unfair competition in violation of G.L.c. 93A, §11. General Laws c. 93A, §11 provides in relevant part:
Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice . . . may bring action in the Superior Court ... for damages and equitable relief. . .
G.L.c. 93A, §11.
To determine whether the Phoenix’s actions constitute unfair and deceptive acts under G.L.c. 93A, §11, the court must determine whether the acts of the Phoenix fell within a penumbra of statutory or common law standards of unfairness or were immoral, unethical, oppressive, or unscrupulous or caused substantial injury to consumers or competitors. PMP Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975). White must submit evidence that the conduct of the Phoenix toward White would be objectionable to a seasoned business person. Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979). The level of obj ectionable conduct “must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Id. Whether a given practice is unfair or deceptive must be determined from the circum *347 stances of each case. Don Lorenz, Inc. v. Northampton Nat’l. Bank, 6 Mass.App.Ct. 933 (1978).
The evidence White offers reveals that the Phoenix refused to publish the Club Line number despite requests from Carnes and Porter. In addition, agents of the Phoenix gave Carnes a tour of the Phoenix’s computer room that was capable of providing an informational telephone club line service. The submitted evidence warrants, while not requiring, an inference that the Phoenix used its considerable clout to discourage use of the Herald Club Line by at least two club agents.
The Phoenix cites PMP Associates, which stated “the publication and sale of newspapers is a private enterprise as distinguished from a business affected with public interest and . . . those engaged in such a business are free to deal with whomever they choose.” PMP Associates, supra at 594, citing J.J. Gordon, Inc. v. Worcester Telegram Publishing Co. Inc., 343 Mass. 142, 143-44 (1961). The Supreme Judicial Court further stated that a publisher is under no obligation to accept advertising from all who apply for it, and a newspaper is free to reject advertising as it sees ñt. PMP Associates, supra at 594. The Com! held that a newspaper’s mere refusal to sell advertisement space, without anything more, does not constitute unfair or deceptive trade practices and is therefore not unlawful under G.L.c. 93A. PMP Associates, supra at 596. In PMP Associates, however, the Supreme Judicial Court made clear that the general rule allowing newspapers to refuse to sell advertising space, was tempered by the proscriptions of anti-competitive laws. A newspaper which rejects advertising in order to achieve an anti-competitive purpose may well run afoul of the prohibitions of G.L.c. 93A. PMP Associates, supra at 597-98. Accordingly, the evidence, viewed in a light most favorable to White, raises an issue of fact concerning the Phoenix’s refusal to print the Club Line number at Carnes’s and Porter’s request and, if there were such refusals, the motivations for them. There exists, therefore a genuine dispute as to whether this amounts to an unfair business practice by the Phoenix in violation of G.L.c. 93A.
The Phoenix’s attempt to demonstrate that White has suffered no damage also must fail. A cause of action under G.L.c. 93A requires the aggrieved party to demonstrate a loss of money or property. In a motion for summary judgment the moving party bears the burden of affirmatively showing that the proof of an element is unlikely to be forthcoming at trial. Flesner, 410 Mass. at 809. The Phoenix has the burden of demonstrating proof of damage will unlikely be forthcoming by White at trial. The Phoenix offers White’s deposition testimony which states that his involvement with the Club Line stopped when his daughter was bom on May 15, 1992. (White’s deposition, p. 1-8.) The Phoenix reasons that this testimony means that White suffered no damages which could be attributed to the Phoenix’s actions. This court draws no such inference.
To the contrary, the evidence White offers raises an issue of the Phoenix’s anti-competitive motive for not advertising the Club Line, and supports a reasonable inference that White’s business suffered as a direct result of the Phoenix’s refusal to publish the Club Line number. Both Carnes and Porter specifically requested the Phoenix to publish the Club Line number with their ads. An inference may be drawn that the Phoenix used its considerable clout to discourage use of the Club Line and would not publish the number in its newspaper, and this practice prevented White from becoming more widely known through advertisement. Furthermore, the Phoenix’s own use of a club line suggests that it was a money-making idea. Although there is not an abundance of evidence on the point, there is sufficient evidence at this stage of the litigation to survive the defendants’ motion for summary judgment.[6]
For all of the foregoing reasons, summaryjudgment is denied on Count I.
II. Intentional Interference with Contractual Relationship (Counts VI, VIII, IX, XIII).
White contends that the Phoenix, through its authorized agents, intentionally interfered with contractual relations between White and customers of the Boston Herald Club Line. To establish an action for intentional interference with contractual relations, the following elements must be proved: (1) the plaintiff had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant’s interference, in addition to being intentional, was improper in motive or means, and (4) the plaintiff was harmed by the defendant’s actions. G.S. Enterprises, Inc., 410 Mass. at 272.
The only evidence White offers to demonstrate that the Phoenix interfered with any contractual third-party relationship is the relationship between White and Carnes. As discussed above, the Phoenix has set forth affirmative evidence in the form of Carnes’s deposition testimony that demonstrates that Carnes’s decision to discontinue a business relationship with the Boston Herald Club Line occurred because Carnes was dissatisfied with the Club Line service. The testimony of Carnes clearly indicates that the Phoenix’s tour of its computer room did not induce Carnes to breach any agreement with White. Carnes further testified that there was no written contract between her and the Boston Herald Club Line. The relationship between the two existed on a week-to-week basis.
White offers no affirmative evidence to rebut the fact that Carnes was not induced by the Phoenix to breach an agreement between Carnes and White. Accordingly, since White offers no affirmative evidence of wrongful inducement on the part of the Phoenix, there is a complete failure of proof concerning this essential element, and the Phoenix is entitled to summary judgment as a matter of law. See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 *348 (1986). Summaiy Judgment is granted on Counts VI, VIII, XI and XIII.
III. Intentional Infliction of Emotional Distress (Counts VII, IX, X, XII).
White contends that the Phoenix actions amounted to intentional infliction of emotional distress. In order for White to prevail on a claim of intentional infliction of emotional distress he must show the following: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of the conduct; (2) that the conduct was “extreme and outrageous” beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiffs distress, and (4) that the emotional distress sustained by the plaintiff was severe and of the nature that no reasonable person could be expected to endure. Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976).
In Agis, the Supreme Judicial Court warned that the door to recover for intentional infliction of emotional distress should be opened, but narrowly and with due caution. Id. at 144. Liability cannot be predicated upon mere insults, indignities, threats, annoyances, petty oppressions or other trivialities. Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987). To recover, the Supreme Judicial Court has enunciated what behavior constitutes extreme and outrageous and beyond all possible bounds of decency. See e.g., Agis, supra (restaurant manager informed waitresses that stealing had occurred and until identity of perpetrator was established, he fired waitresses in alphabetical order, beginning with the plaintiff, solely because her name began with “A,” causing the plaintiff to suffer mental anguish); George v. Jordan Marsh Company, 359 Mass. 244 (1971) (continuing “dunning tactics” were used to coerce mother to pay emancipated son’s bills); Boyle v. Wenk, 378 Mass. 592, 594-95 (1979) (continuous harassing behavior and phone calls exhibited toward woman who defendant knew had recently returned from the hospital after giving birth). Viewing the facts in a light most favorable to White’s claim, this court finds no evidence that the nature of the conduct engaged in by the Phoenix or, for that matter, the level of distress suffered by White, amounted to the requisite severity needed to pursue a claim of intentional infliction of emotional distress. The Phoenix’s motion for summary judgment is allowed on Counts VII, IX, X, XII.
ORDER
For the foregoing reasons, summary judgment is DENIED for Count I, and is GRANTED in favor of the Phoenix on Counts VI, VII, VIII, IX, X, XI, XII and XIII.

 White filed his complaint in May 1992, bringing suit against the above named defendants and Anheuser Busch Corporation, August Busch & Company of Massachusetts, Inc., D.J. Reardon Company, and James Lourdin. On June 8, 1992, White sought a preliminary injunction to prevent the Phoenix from commencing a phone club line service. Judge White of the Massachusetts Superior Court denied the motion. In April 1993, White voluntarily dismissed Anheuser Busch Corporation and James Lourdin.

 The Phoenix is a weekly newspaper with a heavy emphasis on entertainment listings news in Boston. The Phoenix is in direct competition with the Boston Herald in the Boston area.

 Cames stated in her deposition that “maybe after two weeks, two or three weeks into it, it was a disaster. The ad copy was incorrect, the phone number was wrong, just a disaster. The representative of the Club Line gave me a 1-800 number that I had to call and punch in my ad and make changes; and I said, ‘No, I can’t deal with that.’ " (Carnes’s deposition, p. 9.)

 The plaintiff was afforded additional time, following the hearing on the defendant’s motion for summary judgment, to submit proper affidavits.

 In White’s complaint and affidavit he also contends that the Phoenix was blackballing one of White’s former employers, the Middle East Cafe, located in Cambridge, Massachusetts. White worked there from January through May, 1992. (White affidavit, para. 16.) Deposition testimony of the owners of the Middle East Cafe demonstrates that no such blackballing occurred. (See the Phoenix’s opposition to motion to depose Bonnie Bouley, exhibits B, C, and D.) Since White offers no admissible evidence to rebut the deposition testimony of the Middle East Cafe owners, there is no dispute of fact that blackballing did not occur between the Phoenix and the Middle East Cafe.