JAMES G. MALAPANIS *vs.* MANOUCHEHR S. SHIRAZI.

Middlesex.  November 14, 1985. — January 6, 1986.

Present: GREANEY, C.J., CUTTER, & WARNER, JJ.

*Limitations, Statute of. Medical Malpractice,* Statute of limitations. *Practice, Civil,* Summary judgment.

In a medical malpractice action commenced on March 8, 1982, against an orthopedic surgeon who had treated the plaintiff for a fracture of his right femur, summary judgment was properly entered for the defendant on the ground that the action was barred by the three-year statute of limitations for medical malpractice actions, where by the time of his last visit with the defendant on April 23, 1973, the plaintiff had knowledge of facts which, taken in combination, disclosed that the defendant's removal of the plaintiff's leg from traction before the alignment of the bones had become stable was the likely cause of his permanent disability. [382-389]

CIVIL ACTION commenced in the Superior Court Department on March 8, 1982.

A motion for summary judgment was heard by *Elizabeth A. Porada,* J.

*Joseph M. Olivenbaum* for the plaintiff.

*D. Alice Olsen* (*Elizabeth Butler Heath* with her) for the defendant.

GREANEY, C.J. About nine years after he was discharged from treatment by the defendant, Shirazi, an orthopedic surgeon, the plaintiff brought an action for medical malpractice, claiming that Shirazi had negligently treated his broken leg. The defendant filed an answer that raised the defense of the statute of limitations. A judge of the Superior Court allowed the defendant's motion for summary judgment, Mass.R.Civ.P. 56 (b), 365 Mass. 824 (1974), ruling that the plaintiff's action was barred by the three-year statute of limitations for medical malpractice actions contained in G. L. c. 260, § 4. Judgment entered for the defendant, and the plaintiff has appealed.

The materials before the judge disclose the following.[1] While riding a motorcycle on April 30, 1972, the plaintiff was hit by an automobile and sustained a serious fracture of his right femur. He was taken to a hospital in Lowell where he was treated by the defendant. The defendant put stitches in a four-inch laceration above the plaintiff's knee and placed the plaintiff's broken leg into a skeletal traction and balance suspension so that "weight would be applied to bring the bones [in the] leg together." The plaintiff was admitted as an inpatient. While in traction, he was seen by the defendant and two other doctors from the defendant's group.

On June 6, 1972, the defendant told the plaintiff that the leg had healed sufficiently for the plaintiff to be taken out of traction and placed in a spica body cast. The next day traction was removed at the defendant's direction and a body cast applied. Upon removal from traction, the plaintiff experienced considerable pain. One day later (June 8), the defendant told the plaintiff that X-rays had disclosed that he (the defendant) "had taken [the plaintiff] out of traction too soon" and that "the bones had slipped over each other."[2] According to the plaintiff's deposition testimony, the defendant made no mention of the plaintiff's going back into traction so that the bones could be realigned. The defendant told him that the bones would heal in a misaligned position but that "they would be just fine in that fashion." The only adverse result which the plaintiff then understood would occur was that he would have to remain in the body cast for about nine weeks rather than the four or five weeks originally predicted.

On June 10, 1972, the plaintiff was discharged from the hospital to convalesce at home while the body cast remained in place. He was readmitted to the hospital on August 14,

---

[1] These materials include portions of the plaintiff's medical records, an affidavit by the plaintiff, his answers to the defendant's interrogatories, and portions of the plaintiff's deposition taken by the defendant.

[2] The lateral projection X-rays taken on June 7, after the plaintiff had been taken out of traction, disclosed that the bone fragments in the leg had changed position so that the lower (distal) fragment was no longer in contact with the upper (proximal) one.

1972, for removal of the cast and remained there until August 19, 1972. The x-rays taken after the cast was removed that the fracture had healed but that significant bony bridging and 30° angulation had developed at the fracture site. The plaintiff noticed that his leg appeared excessively skinny and crooked once the cast was removed.

Thereafter, the plaintiff saw a physical therapist at the defendant's office once or twice a month for a two-month period. He had appointments with the defendant on October 3 and November 20, 1972, and again on January 8, March 12, and April 23, 1973. During these visits, X-rays of the leg were taken. The plaintiff viewed the X-rays, and he saw the overriding angulation of the bones in the leg.[3]

The plaintiff also indicated in his deposition testimony that each stage of the recovery process took longer than the defendant had told him it would. For example, he had been advised by the defendant that he would be able to put some weight on the leg when the cast came off, but it was actually another two months before he could do so. In August, 1972, the defendant reportedly told him that he would have to use crutches for two months. However, the plaintiff was not able to walk without crutches until mid-November.

In addition to the delayed recovery process, the plaintiff experienced serious problems with his leg from the time the cast was removed in August, 1972, through the time of his discharge by the defendant in April, 1973. As previously noted, when the cast was first removed, his leg appeared crooked. It still appeared crooked in 1973. In 1972 and 1973, the plaintiff walked with a pronounced limp. As early as March, 1973, the plaintiff was also experiencing hyperextension of his knee, a condition which caused a "nail-like" pain.

Further, according to the plaintiff's deposition testimony, the defendant started his course of treatment "with being very optimistic." After the plaintiff was informed that he had been removed from traction prematurely, that the bones had slipped

---

[3] The X-ray taken on October 3, 1972, showed the "distal fragment in about 30° angulation and posteriorly [positioned]."

past each other, and that a prolonged stay in the body cast would be involved, the plaintiff was told that "there would be no complications from it." As to the limp, the defendant assured the plaintiff that once the muscles in his leg were redeveloped he would no longer limp. At some later point, the plaintiff was advised that his angulation problem was not "an unusual result" and that he "would have to put up with the pain and discomfort that existed." However, by the time of his last visit with the defendant on April 23, 1973, the plaintiff was told by the defendant that he would lose motion in his leg, that he would have a partial disability, including hyperextension of the knee and an inability to squat, and that he would probably limp, but "that's the way things were." The plaintiff understood that his disability would be permanent. At the end of his final visit, the defendant discharged him and did not instruct him to return.

In the years following his treatment, the problems the plaintiff had experienced in 1972 and 1973 remained substantially unchanged. The "excruciating pain" he felt for two to three weeks after being removed from traction was still present in February, 1984. The hyperextension of the knee recurred, as did the accompanying "nail-like" pain, which would last as long as three weeks. By 1984 these problems occurred only slightly less often than they had in 1973.

The plaintiff's right leg is still "turned in" and appears crooked, as it has throughout the years since 1973, although the crookedness was somewhat less pronounced in 1984 than in 1973. As early as 1973, the plaintiff also observed that his right leg was shorter than the left. Although the severity has gradually decreased, he also continues to walk with a limp. He has experienced the limp, the deformity, and pain continuously from 1973 through 1982. He has also suffered recurring episodes of hyperextension. All of these conditions were worse in 1973 than they were in 1982, when the plaintiff commenced this action.

Despite his continuing problems, the plaintiff consulted no one concerning his leg or his various symptoms for almost eight years after his last visit to the defendant in April, 1973.

In December, 1980, the persistent difficulties with the leg led the plaintiff to consult with the defendant once again. The defendant advised him that his condition might improve if the leg were surgically broken again and the full treatment repeated, a course which the plaintiff declined to follow.[4]

In 1972 or 1973, the plaintiff retained an attorney to represent him in a claim against the driver of the automobile that had hit him and damaged his leg in 1972. The plaintiff discussed the case with his attorney and made decisions about it. The attorney obtained the plaintiff's medical records from the defendant and used them in pursuing the accident claim.

In November, 1981, the plaintiff read a newspaper article about a lawsuit against the defendant. After reading the article, he made contact with his present counsel, who was handling the case mentioned in the newspaper article. The plaintiff came to believe that he too had a cause of action against the defendant. As a result, this complaint was filed on March 8, 1982. In August, 1983, the plaintiff obtained an opinion from another orthopedic surgeon, who had reviewed the plaintiff's medical records. This doctor stated that the plaintiff had received "substandard care" as a result of the defendant's failure to take prompt measures to remedy the angulation caused by the plaintiff's premature removal from traction.

In medical malpractice cases, Massachusetts recognizes "the principle that a plaintiff should be put on notice before his claim is barred." *Franklin* v. *Alpert,* 381 Mass. 611, 619 (1980). See also *Teller* v. *Schepens,* 381 Mass. 621 (1980). A cause of action for malpractice will "accrue when the plaintiff learns, or reasonably should have learned, that he has been harmed by the defendant's conduct." *Franklin* v. *Alpert, supra.* This is the so-called discovery rule. Massachusetts does not require discovery of each of the elements of the cause of action — duty, breach, causation, and damages before the limitation clock in G. L. c. 260, § 4 starts ticking. *Fidler* v. *E.M. Parker*

---

[4] All of the plaintiff's claims concerning the defendant's alleged negligence concern his treatment of the plaintiff in 1972, or 1973, at the latest. Nowhere in the trial record, or on appeal, is it alleged that the defendant was negligent with respect to the December, 1980, consultation.

*Co.*, 394 Mass. 534, 546 (1985), approving the standard set forth in *Fidler* v. *Eastman Kodak Co.*, 714 F. 2d 192, 199 (1st Cir. 1983).[5] Rather, the three-year limitations period commences to run when a reasonably prudent person (in the tort claimant's position), reacting to any suspicious circumstances of which he might have been aware (what the Court of Appeals in *Fidler* called "likely cause"), should have discovered that he had been harmed by his physician's treatment. On an appropriate record, summary judgment may be granted on the question whether a particular statute of limitations has run. See *White* v. *Peabody Constr. Co.*, 386 Mass. 121, 128-130 (1982); *Mansfield* v. *GAF Corp.*, 5 Mass. App. Ct. 551 (1977); *Gore* v. *Daniel O'Connell's Sons*, 17 Mass. App. Ct. 645 (1984); *Graveline* v. *BayBank Valley Trust Co.*, 19 Mass. App. Ct. 253 (1985); *Fidler* v. *Eastman Kodak Co., supra.*

We think that this case presents such a record. By the time of his discharge from the defendant's care on April 23, 1973, the plaintiff, according to his own incontroverted testimony, knew the following facts: (1) that he had been taken out of traction by the defendant too soon, an event that had resulted in the bones of his leg slipping out of alignment; (2) that premature removal from traction required that he remain an extra four or five unanticipated weeks in a body cast; (3) that his long convalescence in a body cast had failed to correct the misalignment; (4) that the bones had healed in their misaligned position, with 30° angulation at the fracture site; (5) that each stage of the recovery process had taken longer than predicted by the defendant; (6) that, despite the defendant's assurances that he would not limp, he was limping; (7) that he was continuing to experi-

---

[5] The holdings of the two *Fidler* decisions — that a claim accrues when a plaintiff discovers or, in the exercise of reasonable diligence should discover, the critical facts of injury and their connection with the defendant — pertain to the application of the statute of limitations in a products liability case. We have no doubt that the test is the same in a medical malpractice case. We so noted in *Lear-Heflich* v. *Schwartz, post* 928 (1985). We perceive no overriding public policy that would call for different tests, depending upon whether a products liability or medical malpractice case is involved.

ence pain and hyperextension of the knee; (8) that his leg was deformed; and (9) that his disability was permanent. These are precisely the facts upon which the plaintiff now bases his claim of negligence.[6] The plaintiff, therefore, had knowledge in 1973, during a period when he was represented by counsel in his accident case, of facts which, taken in combination, disclosed that the defendant's removal of his leg from traction before the alignment of the broken bones had become stable was the likely cause of his permanent disability. "Thus on notice, the [plaintiff] ha[d] the duty to discover from the legal, scientific, and medical communities whether [such a] theory of causation [was] supportable and whether it support[ed] a legal claim. Thus on notice, his cause of action [was] no longer inherently unknowable." *Fidler* v. *Eastman Kodak Co.,* 714 F.2d at 199. See also *United States* v. *Kubrick,* 444 U.S. 111, 123-124 (1979).

In an effort to circumvent this conclusion, the plaintiff points to the statements made to him by the defendant at various times

---

[6] In answer to defendant's interrogatory no. 10(a), which asked for conversations with the defendant concerning the alleged malpractice, the plaintiff stated that he had had "numerous conversations with the defendant about various aspects of my treatment", but that "[t]he one conversation that remains clear in my mind to this date [February 9, 1984, when the interrogatories were answered] is the one which took place on the day after my traction was removed. . . [when] Dr. Shirazi told me — 'We took you out of traction too soon.'"

In answer to defendant's interrogatory no. 13, which asked for "all the facts upon which you rely in alleging that the defendant rendered . . . improper care," the plaintiff stated:

> "The defendant said he took me out of traction too soon. After the defendant took me out of traction, each stage of treatment took longer than he said it would. When he put the body cast on me he said I would have it for six weeks. The next day he said it would be nine weeks. The defendant had indicated that I would be able to put some weight on my right leg when the cast came off, but it was two months after the cast was removed before I could do so."

> "I understand that my angulation problem could have been and should have been corrected immediately when it was first recognized and that all of the problems I now have with my lower back, right hip and right knee and leg are directly related to the incorrect angulation problem which was caused by Dr. Shirazi taking me out of traction too soon."

during the course of his treatment. These include remarks that the angulation was not "an unusual result," that he would have to "put up with the pain and discomfort," and, as the permanent nature of the disability became more and more apparent, that "that's the way things were."[7] The plaintiff argues that these statements, made to a seventeen year old, lulled him into believing that the defendant had done about as good a job as could be expected in repairing a very bad fracture. Thus, the plaintiff concludes, the statements are sufficient to create an issue of fact as to whether the statute of limitations should have been suspended until 1981, when he read the newspaper article and became aware that he might have been wrongfully harmed by the defendant.

The defendant's statements that the plaintiff would have to "put up with the pain and discomfort" and that "that's the way things were" indicated that the plaintiff had reached an unsatisfactory end result. It is suggested that the statements may have deterred the plaintiff from seeing another doctor. We see nothing in the statements to negate the effect of the defendant's earlier statement which had made a lasting impression on the plaintiff, see note 8, *infra*. Viewed objectively, the statements simply reinforced the conclusion that nothing more could be done medically by the defendant to correct an obviously bad result.

The statement that the result was not "unusual" is most reasonably understood to mean that, based on the course of treatment, the outcome was to have been expected. In light of the plaintiff's age during treatment, and in view of the possibility that such a remark might deter even a mature patient from seeking other medical advice, the statement has given us

---

[7] In various parts of his affidavit, his interrogatory answers, and deposition, the plaintiff asserts that the defendant "led him to believe" certain facts that should suspend the running of the statute of limitations. We disregard these assertions as insufficient in a summary judgment analysis since they would not be admissible at trial. The inquiry with respect to a rule 56 motion deals only with materials which, if the case were put to trial, would be proper for admission in evidence. A conclusory statement about subjective personal beliefs would not be admissible in evidence.

pause. However, even though a patient may typically be expected to place some confidence in a physician's explanations or reassurances, we think that this plaintiff's attention had been adequately directed to the traumatic events (the premature removal from traction and poor recovery) to put him on notice that the defendant's conduct might have caused his harm. This is especially so because of the state of the plaintiff's subsequent knowledge (see facts 1 through 9 set forth above) and the defendant's distinctly negative prognosis when the treatment ended. We conclude that the plaintiff had been pointed toward the relationship between his harm and the doctor's actions to a degree sufficient to stimulate further inquiry. See *Drazan* v. *United States,* 762 F.2d 56, 58 (7th Cir. 1985). If it were otherwise, total understanding of the causal connection would be necessary to accrual of the cause of action and the limitations period would almost never run.[8]

We find support for this conclusion in the reasoning of the United States Court of Appeals for the First Circuit in *Fidler* v. *Eastman Kodak Co., supra,* where a claim similar to the plaintiff's was rejected. The plaintiff in that case had undergone a number of medical procedures to discover the cause of her severe headaches. *Id.* at 194-195. On September 7, 1978, following one such test, her physician told her that it had re-

---

[8] The plaintiff argues on appeal that the defendant's statements constituted an attempt to conceal the fact that he had rendered improper care thereby tolling the statute of limitations. However, the plaintiff has not argued that the statements amounted to fraudulent concealment under G. L. c. 260, § 12. Nor did the plaintiff assert in his opposition to the motion for summary judgment that the defendant had fraudulently concealed the cause of action. Since the issue was not raised below, it may not be raised on appeal. *Babco Indus., Inc.* v. *New England Merchs. Natl. Bank,* 6 Mass. App. Ct. 929, 931 (1978). (In any event, it is doubtful that the plaintiff has shown anything which would create a triable issue on fraudulent concealment within the meaning of G. L. c. 260, § 12. "Ordinarily . . . [a] failure to inform the plaintiff of the facts upon which [his] cause of action rests is not a fraudulent concealment within the meaning of the statute . . . . The fraud referred to in the statute must be actually accomplished by positive acts done with intention to deceive." *Maloney* v. *Brackett,* 275 Mass. 479, 484 (1931). See *Frank Cooke, Inc.* v. *Hurwitz,* 10 Mass. App. Ct. 99, 106-108 (1980). If someone, like the plaintiff in this case, is deemed to know the facts upon which his claim rests, there can be no fraudulent concealment. *Ibid.*

vealed Pantopaque, the contrast medium used in some X-rays, in her spinal column "close to some nerve endings, and it [was] causing some scar tissue." A few weeks later, the doctor again discussed the Pantopaque with the plaintiff but advised her that he did not believe that she had a claim against anyone, adding, "[t]here are thousands of people walking around with [Pantopaque] in their bodies with no complaints." The doctor also stated that he was unsure that the plaintiff's headaches were caused by Pantopaque.

The Court of Appeals upheld the allowance of the defendant's motion for summary judgment and concluded that the plaintiff's action had accrued no later than September 7, 1978, when her physician advised her for the first time that Pantopaque had been found in her spinal column and that it was causing scar tissue. *Id.* at 197. The court reasoned (at 200) that, even though the physician's statements did not show a "firm conviction of causation", the cause of the plaintiff's headaches was no longer inherently unknowable. As to the effect of the statements relied upon by the plaintiff to create a triable issue of fact, the court (at 200) noted the following: "[Another] argument is that the more doubtful statements of opinion as to causation made by [the plaintiff's physician] subsequent to September 7, 1978, should be taken into account in assessing the import of his September 7 statements. But were we to consider later statements capable of raising an issue of fact as to notice of causation, notwithstanding a more forceful earlier statement, the running of a limitations period would be subject to cancellation with every change in a doctor's thinking. Eleventh hour waffling could place the parties back at square one. Any hope for repose would be illusory." The apparent acceptance of this reasoning by the Supreme Judicial Court in *Fidler* v. *E.M. Parker Co.*, 394 Mass. at 546, would seem to indicate that statements like those relied upon by the plaintiff cannot defeat a motion for summary judgment where it is otherwise evident that a patient should have been aware that his physician's conduct was possibly wrongful.[9]

---

[9] We also think rejection of the plaintiff's argument, at least in a case like this one, renders a more practical policy result. In most cases, a patient's

Nor are we persuaded to reverse the judgment by the plaintiff's remaining arguments: (a) that he reasonably discovered that he had been harmed by the defendant's treatment in November, 1981, when he saw a newspaper article about another lawsuit against the defendant and then consulted his present counsel to see whether he had a viable claim against the defendant; or (b) that he may also have first made this discovery when he received a second medical opinion that malpractice had occurred, in 1983, about eighteen months after he had commenced this action. These events merely provided the plaintiff with further details as to the specific manner in which he had been harmed by the defendant's allegedly negligent conduct. However, discovery of the exact legal theory upon which a claim of malpractice can be based is not among the inherently unknowable facts that will operate to delay the accrual of a cause of action. See *Gore* v. *Daniel O'Connell's Sons,* 17 Mass. App. Ct. at 647; *Fidler* v. *Eastman Kodak Co.,* 714 F.2d at 199. Contrast *Stoleson* v. *United States,* 629 F.2d 1265 (7th Cir. 1980) (limitations period under Federal Tort Claims Act did not begin until plaintiff learned of new research establishing previously unknowable causal connection between her cardiovascular problems and occupational exposure to nitroglycerine.) All that is necessary to commence the running of the limitations period is knowledge of harm and its likely cause. These conditions were satisfied in 1973. That

---

treatment will be completed well within the three-year period afforded by G. L. c. 260, § 4, for the commencement of a malpractice action. If the patient has reason to doubt the adequacy of his doctor's treatment, he can (and probably should) inquire of professionals, doctors or lawyers, to ascertain whether he has been wronged. Upon securing competent advice, the patient will then be able to make an intelligent decision on whether he has a basis for a claim, and do so within the legislatively established three-year period for commencing suit. Acceptance of the plaintiff's approach to the case would leave too many claims open-ended. Conceivably, the claim in this case might not have been discovered until sometime in the next century, especially if its discovery is deemed dependent on a fortuitous event like the publication of a newspaper article. This would create a situation where there would be no prescribed or predictable limitations period.

being the case, the Superior Court judge ruled correctly when she allowed the defendant's motion for summary judgment.

*Judgment affirmed.*