JOYCE A. SWASEY *vs.* MELVIN M. BARRON.

No. 96-P-1584.

Norfolk. January 14, 1998. - January 12, 1999.

Present: PORADA, KAPLAN, & BECK, JJ.

*Attorney at Law,* Malpractice. *Limitations, Statute of.*

Where there was no genuine issue of material fact whether an attorney's client
knew or should have known that she was harmed by the attorney's conduct
more than three years before she filed her complaint for malpractice, the
action was untimely under G. L. c. 260, § 4, as amended through St. 1987,
c. 418, and summary judgment was correctly ordered for the defendant at-
torney. [130-133]

CIVIL ACTION commenced in the Superior Court Department on
November 30, 1992.

The case was heard by *Robert W. Banks,* J., on a motion for
summary judgment.

*Valeriano Diviacchi* for the plaintiff.
*Stephen J. Duggan* for the defendant.

BECK, J. Sixteen years after signing a stipulation of settlement
in her divorce action, the plaintiff filed a complaint alleging at-
torney malpractice (as well as breach of fiduciary duty,
intentional infliction of emotional distress, and violation of
G. L. c. 93A) against the defendant, a lawyer who represented
her in the divorce. She claims her action is timely because she
filed it within three years of her discovery that it was the
defendant's failure to investigate her husband's finances, rather
than her husband's misrepresentations about his assets, that
caused her to accept an unfair settlement. A Superior Court
judge rejected this argument and allowed the defendant's mo-
tion for summary judgment on the ground that the action is time
barred. For the reasons set out below, we affirm the judgment of
the Superior Court.

*The facts.* "We recite the relevant facts in the light most

favorable to the plaintiff[], who opposed the motion for summary judgment," *Murphy* v. *Smith*, 411 Mass. 133, 134 (1991), assuming the truth of the facts the plaintiff alleges. See *Lindsay* v. *Romano*, 427 Mass. 771, 771 (1998). The plaintiff filed for divorce in 1974 after twenty-two years of marriage. She was initially represented by another attorney, but when he was unavailable at a critical time in the proceedings, she contacted the defendant, who agreed to represent her. There were hearings before a master on four days between July and October of 1975, at which the plaintiff was present. During the second hearing, the plaintiff learned that her husband had separate checking accounts that she knew nothing about. She then "insisted that [the defendant] do something to find out about [this] money."

On November 4, 1976, on the way to a court hearing in the case, the defendant told the plaintiff he would have to withdraw from her case at the conclusion of the day's proceedings. He referred to a police report that an officer in the plaintiff's educational toy company (which she founded and of which she was president) was about to be arrested and held for cocaine trafficking. The defendant told the plaintiff that his firm did not want to be in the newspapers as representing a company or principal in such a situation. He urged her to get everything settled that day. The defendant strongly advised her to sign the stipulation of divorce her husband's lawyer had drafted; he claimed it was consistent with the master's report.

After signing the stipulation, the plaintiff was in a state of shock that her lawyer would not represent her anymore. She "determine[d] . . . that [she] was vastly disappointed by a lawyer once again."

The plaintiff did not see the master's report until the day she signed the stipulation. (The stipulation is not part of the record. Nor are the docket sheets in the divorce action. See Mass.R.A.P. 18[a], 378 Mass. 940 [1979].) The master found that the husband's net worth was $101,760, which was the amount shown on the husband's December 31, 1974, balance sheet. Subsequent balance sheets, dated April 30 and September 30, 1976, before the master issued his report, showed increased net worth. The later balance sheets also showed a significant increase in the value of the husband's interest in a limited partnership, although the master made no findings as to the value of that interest. The defendant failed to inform the plaintiff of either of these revised financial statements.

In May, 1978, a year and one-half after the divorce, and after the plaintiff's financial situation had deteriorated and her former husband was failing to pay his share of the children's educational expenses, the plaintiff sought modification of the terms of her divorce. The 1978 modification action successfully sought funds for college for the two younger daughters. In a letter to the lawyer who represented her in that proceeding, she wrote, "I believe that [my ex-husband] has income other than that reported, and I do not think that his financial records would stand close scrutiny." At her October, 1994, deposition in this action, the plaintiff testified she did not trust her husband's handling of their finances beginning in 1974.

Eleven years later, in December, 1989, apparently after a chance conversation with yet another lawyer, the plaintiff began a review of the records concerning her divorce, during which she first discovered inconsistencies in her ex-husband's testimony. In October, 1991, the plaintiff's former husband died, leaving a sizable estate. She filed a complaint against the estate for fraud in July, 1992, as well as a complaint for modification of the divorce settlement, apparently in October, 1992. She settled the complaint against the estate for $3,000 when the estate persuaded her that "the factual basis for locating the marital assets" had been disclosed in the master's hearings and that any claim as to a share of those funds was therefore barred by res judicata. The complaint for modification was dismissed. The plaintiff claims the failure of her suit against the estate was the first notice that "the [d]efendant had caused [her] appreciable harm" because it was his failure to investigate her husband's finances, rather than her husband's misrepresentations, that produced the unfair settlement. On this theory, she argues that the instant action, filed on November 30, 1992, was within three years of her discovery that her lawyer was at fault.

*The law.* "Actions of contract or tort for malpractice, error or mistake against attorneys . . . shall be commenced only within three years next after the cause of action accrues." G. L. c. 260, § 4, as amended through St. 1987, c. 418. A cause of action accrues when "the plaintiff knows or reasonably should know that he or she has been harmed by the defendant's conduct. The plaintiff need not know the extent of the injury or know that the defendant was negligent for the cause of action to accrue. Once a client or former client knows or reasonably should know that he or she has sustained appreciable harm as a result of the

lawyer's conduct, the statute of limitations starts to run." *Williams* v. *Ely*, 423 Mass. 467, 473 (1996) (citations and footnote omitted). See *Massachusetts Elec. Co.* v. *Fletcher, Tilton & Whipple, P.C.*, 394 Mass. 265, 268 (1985) (subsequent need to hire a lawyer to address issues mishandled by previous lawyer constitutes appreciable harm); *Cantu* v. *St. Paul Cos.*, 401 Mass. 53, 57 (1987) (same). "Massachusetts does not require discovery of each of the elements of the cause of action — duty, breach, causation, and damages before the limitation clock in G. L. c. 260, § 4, starts ticking." *Malapanis* v. *Shirazi*, 21 Mass. App. Ct. 378, 382 (1986). "If it were otherwise, total understanding of the causal connection would be necessary to accrual of the cause of action and the limitations period would almost never run." *Id.* at 386. "Statutes of limitation are 'vital to the welfare of society . . . . They promote repose by giving security and stability to human affairs' . . . [and] 'encourage plaintiffs to bring actions within prescribed deadlines when evidence is fresh and available.' " *Olsen* v. *Bell Tel. Labs., Inc.*, 388 Mass. 171, 175 (1983), quoting from *Franklin* v. *Albert*, 381 Mass. 611, 618 (1980).      .

*Discussion.* "The issue before us is whether the evidence on the record present[s] any genuine issue as to whether [the plaintiff's] action was barred by the statute of limitations." *Riley* v. *Presnell*, 409 Mass. 239, 242 (1991). Applying the legal principles discussed above to the facts of this case, we conclude that the plaintiff's action comes too late.

There were several points, well before her action against her ex-husband's estate failed, when the plaintiff knew or reasonably should have known that the defendant had caused her harm. See *Williams* v. *Ely*, 423 Mass. at 473. Perhaps the first was the defendant's sudden refusal to continue representing her. See S.J.C. Rule 3:07, Canon 2, DR 2-110, as appearing in 382 Mass. 774 (1981) ("[A] lawyer shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client, including giving due notice to his client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled . . . "). See now S.J.C. Rule 3:07, Mass.R. Prof.C. 1.16(d), as appearing in 426 Mass. 1370 (1998). See also Mass.R.Civ.P. 11(c), 365 Mass. 753 (1974). The sudden withdrawal in this case may have been particularly injurious since the plaintiff had not received an advance copy of either

the master's findings or the stipulation, and she was unaware of the revised financial statements. She did, however, receive the master's report and the stipulation that day, and she knew immediately that she was "vastly" disappointed in the defendant's conduct. She also knew that she had had to "insist" that he investigate her husband's hidden bank accounts.

Next was the plaintiff's action for a modification, in which she hired another lawyer, an action suggesting that she was harmed by the terms the defendant had negotiated. See *Cantu* v. *St. Paul Cos.*, 401 Mass. at 57. At that point, in a letter to the lawyer handling the action for modification, she explicitly stated that she did not think her husband's finances could stand "close scrutiny," implicitly acknowledging that the defendant had not made the necessary examination. The combination of her continuing suspicions about her husband's finances, the defendant's performance in representing her interests during the master's hearings at which she was present (failure to discover the hidden bank accounts and failure to give her copies of important documents), his abrupt departure, and the engagement of a new lawyer to handle the modification should have put the plaintiff on notice sufficient to trigger some further examination of the defendant's conduct. Compare *Malapanis* v. *Shirazi*, 21 Mass. App. Ct. at 384, in which we affirmed summary judgment for the defendant doctor, concluding that, once on notice of the likely cause of his injury, the medical malpractice plaintiff "ha[d] the duty to discover from the legal, scientific, and medical communities whether [the] theory of causation [was] supportable and whether it support[ed] a legal claim," with *Lindsay* v. *Romano*, 427 Mass. at 774-776, in which the Supreme Judicial Court reversed summary judgment for the defendant doctor where the medical malpractice plaintiff consulted seven different physicians, none of whom was able to diagnose the cause of the symptoms that appeared immediately after surgery the defendant performed. In view of the plaintiff's considerable efforts to determine the cause of her harm, the court held that it was a jury question whether the plaintiff reasonably should have discovered the cause of her injuries earlier.

Here, there is nothing in the record, other than the chance meeting with another lawyer, to explain why it took the plaintiff until 1989 to investigate the suspicions she had long held. Indeed, even in the 1978 modification, she sought only the education expenses. The nature of the plaintiff's harm was not

"inherently unknowable" in the many years prior to her action against her ex-husband's estate. See *Hendrickson* v. *Sears*, 365 Mass. 83, 90 (1974); *Gore* v. *Daniel O'Connell's Sons, Inc.*, 17 Mass. App. Ct. 645, 649 (1984) (injury must be "inherently unknowable even in retrospect" to toll statute, quoting from *Urie* v. *Thompson*, 337 U.S. 163, 169 [1940]). While we are mindful of the plaintiff's argument "that it is unsound judicial policy to encourage the initiation of litigation in anticipation that liability may materialize," *International Mobiles Corp.* v. *Corroon & Black/Fairfield & Ellis, Inc.*, 29 Mass. App. Ct. 215, 220 (1990), there are also long-standing important policy considerations underlying enforcement of statutes of limitations. See *Wood* v. *Carpenter*, 101 U.S. 135, 139 (1879).

Although the plaintiff stresses that she did not discover the cause of her harm until the action against her ex-husband's estate, we think it likely that it was in fact the extent of her harm that she did not discover. Uncertainty about the total extent of the damages does not delay the accrual of a cause of action. See *Levin* v. *Berley*, 728 F.2d 551, 554 (1st Cir. 1984).

The cases the plaintiff cites in support of her argument that her claim against the defendant did not accrue until she learned that she could not recover from her husband are distinguishable. In *Spilios* v. *Cohen*, 38 Mass. App. Ct. 338 (1995), we held that a wife's cause of action against the lawyer who represented her in her divorce action did not accrue until the Probate Court rendered its judgment. Only when "the judge's decision was announced" was it clear that the husband's pretrial offer, which the defendant lawyer had rejected despite his client's instructions, was substantially better than the judgment. *Id.* at 340. However, in *Spilios*, the defendant continued to represent the wife, "a decisive fact," which "[brought] the case within the continuing representation doctrine, adopted in *Murphy* v. *Smith*, 411 Mass. 133, 137-138 (1991)." *Spilios* v. *Cohen*, 38 Mass. App. Ct. at 341. There was also evidence in *Spilios* that the defendant had made false representations to the plaintiff as to his trial preparation. *Id.* at 340.

In *Riley* v. *Presnell*, 409 Mass. 239 (1991), which addresses the effect of the "discovery rule" on the accrual of a malpractice action against a psychotherapist, the defendant doctor "ha[d] allegedly caused great psychological harm to [the plaintiff], and that very harm allegedly caused [the plaintiff] to be unable to link the misconduct to the damage." *Id.* at 246. In such

circumstances, the court ruled, it was a question for the jury to determine whether the plaintiff should have recognized the cause of the harm. This principle is not applicable here.

In other cases the plaintiff cites, all from out of State, the defendant contributed to the plaintiff's delay in discovering the cause of her harm by deliberately concealing critical facts from the client. See *Olitkowski* v. *St. Casimir's Sav. & Loan Assn.*, 302 Mich. 303 (1942) (administratrix's attorney prevented her from asserting her rights to funds held in the association the lawyer also represented); *Cohen* v. *Appert*, 463 N.W.2d 787 (Minn. Ct. App. 1990) (defendant attorney actively concealed his relationship with the adjuster, whose proposed settlement offer the attorney urged his client to accept); *Nobes* v. *Earhart*, 769 S.W.2d 868 (Tenn. Ct. App. 1988) (wife's divorce lawyer actively concealed her affair with her client's husband). None of the other out-of-State cases the plaintiff cites suggests a different result here.

*Conclusion.* Without deciding at what point exactly the plaintiff's cause of action accrued, on the record before us, we conclude there is no genuine issue of material fact that she knew or should have known she was harmed by the defendant's conduct more than three years before she filed her complaint. We therefore affirm the judgment of the Superior Court.

*So ordered.*