KEVIN KOE[1] *vs.* GORDON J. MERCER.

No. 05-P-875.

Suffolk. April 11, 2006. - October 31, 2006.

Present: BECK, GELINAS, & COWIN, JJ.

Further appellate review granted, 448 Mass. 1107 (2007).

*Child Abuse. Limitations, Statute of.*

In a civil action filed in 2002, alleging negligence in relation to the sexual abuse of the plaintiff when he was a minor, the judge erred in granting summary judgment in favor of the defendant on the ground that the three-year statute of limitations had expired, where the plaintiff demonstrated a reasonable expectation of proving that he did not make a causal connection between the abuse and his injuries until late 1999 or early 2000 [667-670], and that a reasonable person who had been subjected to the conduct which formed the basis of the plaintiff's complaint would have delayed in filing suit [670-672].

CIVIL ACTION commenced in the Superior Court Department on February 28, 2002.

The case was heard by *D. Lloyd Macdonald,* J., on a motion for summary judgment.

*Carmen L. Durso* for the plaintiff.

*A. Neil Hartzell* for the defendant.

BECK, J. In February, 2005, a Superior Court judge entered summary judgment for the defendant, Gordon J. Mercer, against the plaintiff, Kevin Koe, because the three-year statute of limitations governing Koe's negligence claim had expired. Koe appeals, arguing that there are genuine issues of material fact that preclude entry of summary judgment. We agree with Koe and reverse.

*Facts.* We recite the material facts in the light most favorable to the plaintiff. Koe was born on August 25, 1968. As a child, he and his parents attended the Parkway Christian Center

---

[1] A pseudonym.

(church) in Revere. In the summer of 1983, Koe attended a church picnic. The church's new pastor, Paul Braco, Sr., was also present. After the picnic, Koe told his parents that Braco had touched him in the genital area. At the time, the defendant, Gordon Mercer, was a member of the church's council of pastors and elders, the governing body of the church. Koe's parents met with Mercer and reported the incident to him. Braco himself subsequently explained to Koe's parents that the incident, if there was one, was inadvertent. Koe's parents did not pursue the matter. Nor did Mercer report the incident to anyone or undertake any further investigation. In his complaint, Koe claims that Mercer was negligent in failing to investigate the allegation and in failing to take any corrective action against Braco.

Koe continued to attend the church after the picnic incident. He testified in his deposition that he tried to hide from Braco and thought about killing him. Koe recounted two subsequent incidents in which Braco abused him that occurred when he was fourteen or fifteen years old, but he said that he did not tell anyone about these incidents at the time.

At one point Koe testified that he knew Braco's touching at the church picnic was wrong. However, later in his deposition he stated that he could not decide whether Braco's sexual contacts with him were wrong, because Braco was not punished after the picnic incident. Therefore, he felt Braco's acts may have been permissible.

Approximately one year after the last incident of abuse, Koe ran away from home because he felt abandoned by his parents and, in particular, unprotected by his father. He lived on the streets, began abusing drugs and alcohol, stole food and money, and eventually was placed in the custody of the Department of Social Services.

In December, 1998, Koe began therapy sessions to deal with his anger problems. He testified that he had no memory of Braco's abuse at that time. On February 8, 1999, Koe met with a psychiatrist, Dr. Rafael Ornstein, for a medication evaluation. Doctor Ornstein noted in Koe's medical record of that date that Koe "has had a history of sexual abuse by a pastor." Koe testified that "[b]y that point in time I understood [what Braco had done to me] as definitely wrong." Further, he stated in his

deposition that by February 8, 1999, "I was able to remember and realize, which they were able to make the connection as to, [w]ell, have you ever thought about maybe the reason why is because of this, this and this. And only until that point was I able to think about that."

On February 22, 1999, Koe met again with Dr. Ornstein, who noted, "p[atient] describes sexual abuse by pastor." Koe testified that "[Dr. Ornstein] made a connection at that time for me, yes," and "it was brought to my attention that I guess I was in such denial that that could have been part of it. . . . So when the psychiatrist — When I finally was able to find that memory and bring it forward to [him], that's when the connection was made . . . ." Although his medical records indicate otherwise, Koe in his summary judgment papers stated that "[he] did not realize there was any connection between the feelings of rage he felt and the sexual abuse he experienced as a child until February 22, 1999." Doctor Ornstein stated in his deposition that by March 2, 1999, Koe was still not prepared to discuss the connection, and that such a reaction was consistent with post-traumatic stress disorder.

During the early months of 1999, Koe attended numerous counselling sessions with Linda Bell, a clinical social worker. Her notes of February 10, 1999, reveal that Koe "was able to make the connection of [grieving the loss of his wife and children] with the loss of his family of origin." On March 2, 1999, Bell wrote that "[Koe] is able to identify [his angry, dissociative] state as feeling like a boy about the age of his sexual abuse." On March 22, 1999, she wrote that "[h]e is not ready to make too many connections [to his childhood] yet."

Koe filed the complaint in this case on February 27, 2002. On July 8, 2004, Allen J. Brown, a psychologist, examined Koe and subsequently stated in an affidavit that Koe failed to make and accept the connection between Braco's abuse and his symptoms prior to sometime in late 1999 or early 2000.

*Statute of limitations.* "General Laws c. 260, § 4C, requires that a civil suit alleging sexual abuse of a minor be commenced within three years of the alleged abusive act, 'or within three years of the time the victim discovered or reasonably should have discovered that an emotional or psychological injury or

condition was caused by said act.' " *Doe* v. *Creighton*, 439 Mass. 281, 283 (2003). The statute also "provides that this three-year statute of limitations is automatically tolled until the victim reaches eighteen years of age." *Id.* at 283 n.3.

The discovery rule in G. L. c. 260, § 4C, provides that the three-year limitation period does not begin to run until a plaintiff has both (1) an awareness of his injuries, and (2) an awareness that the defendant caused his injuries. *Id.* at 283. "A plaintiff who invokes the discovery rule by claiming that [his] delay in filing suit stems from a failure to recognize the cause of [his] injuries bears the burden of proving both an actual lack of causal knowledge and the objective reasonableness of that lack of knowledge." *Ibid.* In order "to survive the defendant's motion for summary judgment, the plaintiff must demonstrate a reasonable expectation of proving that [his] suit was timely filed." *Id.* at 284.

*Actual lack of causal knowledge.* Koe argues that he did not make the causal connection between Braco's abuse and Koe's injuries until late 1999 or early 2000, and therefore his complaint against Mercer was timely. After a thorough review of the record, we conclude that Koe has demonstrated a reasonable expectation of proving that his suit was timely filed. Therefore summary judgment in favor of Mercer on this ground was inappropriate.

We acknowledge that Koe admitted in his deposition that, on February 22, 1999, Dr. Ornstein made a connection between Koe's depression, anger, and irritability and Braco's sexual abuse.[2] Furthermore, Koe stated in his summary judgment papers that it was a material fact that "[he] did not realize there

---

[2]Koe testified during his deposition as follows:

*Q.*: "Do you recall whether there was any suggestion made by the individual that you met with on February 22, 1999 that the depression and anger and irritability you were feeling was somehow related to the sexual abuse from Braco?"

*A.*: "Yes. They made a connection at that time for me, yes."

. . .

*Q.*: "And do you remember what they said?"

*A.*: "Not specifically. Only that it was brought to my attention that I guess I was in such denial that that could have been a part of it. I thought there was more to it, that I was just a bad kid. That's part of my problem is I thought it

was any connection between the feelings of rage he felt and the sexual abuse he experienced as a child until February 22, 1999." Koe's purported realization of a connection between Braco's abusive conduct and his own symptoms in many cases would constitute an actual awareness of causal knowledge, and impose on plaintiffs like him a " 'duty to discover from the legal, scientific, and medical communities' whether [he] ha[d] a cognizable legal claim." *Doe* v. *Harbor Schs., Inc.,* 446 Mass. 245, 256 n.13 (2006), quoting from *Malapanis* v. *Shirazi,* 21 Mass. App. Ct. 378, 384 (1986). Contrast *Palermo* v. *Brennan,* 41 Mass. App. Ct. 503, 509 (1996) (plaintiff's deposition testimony admitting knowledge of harm caused by *affair* with therapist did not prove that plaintiff made causal connection between defendant's improper *therapeutic tactics* and resulting harm).

However, this case is distinguishable from *Doe* v. *Harbor Schs., Inc., supra,* in two material aspects. First, unlike Doe's deposition testimony, Koe's deposition is not "replete with specific evidence" that he knew he was harmed before the outermost date for the timing of his complaint. See *id.* at 260-261. Although he admitted that Dr. Ornstein made a connection for him on February 22, 1999, he did not acknowledge that he made any connections himself. Moreover, while Doe testified that people close to her told her that her abuser was "trouble" and her relationship was "unhealthy," *id.* at 261, Koe's deposition testimony indicates that he received no such warnings. His parents did not pursue the matter after Braco called the abuse an accident, and Koe believed that "it was all me. I'm bad, I'm bad, I'm bad."

Second, and perhaps more important, Koe's medical records buttress his assertion that he had not made the connection until sometime after February 28, 1999. Doctor Ornstein's progress notes indicate that the doctor knew of Koe's sex abuse on February 8, 1999, and it was noted again in Koe's medical records on February 22, 1999. However, the notes do not mention that Koe

was all me. I'm bad, I'm bad, I'm bad. And that's all I thought about. So when the psychiatrist — When I finally was able to find that memory and bring it forward to her, that's when the connection was made, and only at that time I believe was the only — that was the last time I even discussed it . . . ."

himself was able to make any connection between the abuse and his psychological symptoms. Not until March 22, 1999, do Linda Bell's notes suggest for the first time that Koe was able to make at least one connection between the abuse and symptoms when she noted that "[h]e is not ready to make too many connections yet."

It is also telling that Bell's notes specifically discuss the precise moments when Koe made other connections relevant to his psychological treatment. In her notes dated February 10, 1999, Bell wrote that "[o]ne theme is grieving the loss of his wife and children. He was able to make the connection with the loss of his family of origin." More subtly, on March 2, 1999, she noted a connection relevant to his abuse when she wrote that Koe experienced a period of rage while in a dissociative state and was "able to identify this state as feeling like a boy about the age of his sexual abuse." Koe's medical records indicate that Bell noted in writing when Koe made a psychologically relevant connection, and we can infer that Bell's omission about any connections between the abuse and his symptoms before February 28, 1999, means that Koe himself did not make any connection by that date. This conclusion is also supported by Dr. Ornstein's deposition testimony, which suggested that Koe was not prepared to discuss the connection on March 2, 1999, and that such a reaction was consistent with posttraumatic stress disorder.

Our reliance on Bell's progress notes and Dr. Ornstein's deposition testimony is not inconsistent with *Doe* v. *Harbor Schs., Inc.,* 446 Mass. at 261. In that case, the Supreme Judicial Court refused to allow Doe to buttress her self-defeating deposition testimony with her therapist's four-paragraph treatment summary that was prepared nearly two years after Doe had commenced legal action. *Ibid.* Here, however, Bell's notes were contemporaneous with her counselling sessions with Koe and were not prepared after Koe had begun legal action. Not only are Bell's contemporaneous progress notes more accurate and reliable than the therapist's treatment summary in *Doe,* but the notes are also likely to be more accurate than Koe's own deposition testimony. Koe's deposition took place almost four years after the relevant 1999 counselling sessions. Combining the

length of time, the nature of alleged harm, and the supporting testimony by Dr. Ornstein, Bell's notes are the best indicator of the exact date on which Koe made a connection.

*Determination of reasonableness.* We next examine the reasonableness of Koe's delay in filing suit from the perspective of "a reasonable person who has been subjected to the conduct which forms the basis for the plaintiff's complaint." *Doe* v. *Creighton*, 439 Mass. at 284, quoting from *Riley* v. *Presnell*, 409 Mass. 239, 245 (1991). "This is not, however, a subjective test; the only individualized characteristics that we consider in making a reasonable person analysis under G. L. c. 260, § 4C, are those that stem directly from the complained-of tort." *Doe* v. *Creighton, supra.* "Personal traits unrelated to the tort, such as cultural background and educational history, are not relevant to the reasonableness inquiry. We focus instead on the nature of the abusive conduct, the injuries that the abuse inflicted, and the effect that both would have had on the causal understanding of an ordinary, reasonable person." *Ibid.* (Footnote omitted.) In order to guide our determination of reasonableness, we look at (1) the victim's age at the time of the abuse; (2) evidence of the abuser's attempt to disguise the nature of the abuse; and (3) whether the abuse was a watershed event in the victim's life. *Id.* at 285.

We first turn to Koe's age at the time of the abuse. Although the record is unclear, it appears that Braco first abused Koe at a picnic when Koe was between thirteen and fifteen years old. This stage of adolescence falls between the victim's age in *Ross* v. *Garabedian*, 433 Mass. 360, 361 (2001) (vacating summary judgment for defendant where victim was thirteen years old when abuse began), and the victim in *Doe* v. *Creighton*, 439 Mass. at 285 (affirming summary judgment for defendant where victim was sixteen when abuse began and seventeen when abuse ended). Koe suffered at least two more incidents of abuse by Braco while he was either fourteen or fifteen years old. Thus, he was young enough when he experienced the abuse that Braco's conduct and its consequences may "have been a distant memory when [he] reached [his] eighteenth birthday, the point at which the limitations period of [G. L. c. 260, § 4C,] normally begins to run." *Ibid.*

Second, the record reveals that Braco attempted to disguise the nature of his abuse. The defendant testified in a deposition that he (Mercer) customarily persuaded children and their families that sexually abusive conduct by Braco was unintentional or "horseplay." He also testified that he routinely requested that families not discuss the incidents of sexual abuse and that he never informed the disciplinary committee about other parishioners' allegations of Braco's sexual abuse. Mercer never notified the congregation about Braco's abuse. Braco himself told Koe's parents that the incident at the picnic was merely an accident.

Finally, we look at whether the abuse was a watershed moment in the victim's life. The rationale behind this factor is that if the abuse was so obvious and remarkable to the victim, it would be unreasonable for the victim to fail to make the connection between the abuse and his or her symptoms in a timely manner. The record in this case does not indicate that the abuse itself was a watershed moment in Koe's life. While Koe ran away from home within one year after the last incident of abuse, he attributed his running away to his father's failure to support his allegations of abuse, and not to the abuse itself. We have acknowledged that personal traits unrelated to the tort are not relevant considerations in the reasonableness inquiry. *Doe* v. *Creighton*, 439 Mass. at 284. However, a parent's reaction to his child's allegation of abuse is directly related to the "injuries that the abuse inflicted," *ibid.*, which is where our focus lies.

Moreover, even if we did consider the abuse as a watershed moment in Koe's life, we would still hold that a reasonable fourteen or fifteen year old might not have made the connection. Although the age of the victim is not the sole determining factor in the reasonableness analysis, it is the strongest. While a seventeen year old may be able to distinguish between symptoms due to abuse and symptoms due to parental abandonment, a fourteen or fifteen year old child may not have reached the developmental stage to make such psychological distinctions, particularly when that youth does not have the support of his parents or legal guardian.

The defendant's attempt to draw an analogy to the facts of this case to those of *Phinney* v. *Morgan*, 39 Mass. App. Ct. 202

(1995), is misplaced. In that case, this court concluded that summary judgment should have entered for the defendant because a reasonable person in the abuse victim's position would have possessed the requisite knowledge to make a connection between the abuse and their alleged harm. *Id.* at 207-208. While the defendant correctly notes that, like Koe, one of the plaintiffs in *Phinney* ran away from home after the abuse, the defendant ignores the fact that there she specifically testified that she ran away from home *because of her father's sexual advances* toward her. *Id.* at 207. In contrast, Koe testified that he ran away from home because of his father's lack of support — not because of the abuse itself. Thus, while a reasonable person who knew that he or she ran away from home because of abuse should have been able to make the requisite connection, a reasonable person who attributed his flight from home to something other than abuse would not be expected to make that connection.[3] We note that the motion judge focused attention on the extensive media coverage about sexual abuse at the time of Koe's therapy sessions. See *Ross* v. *Garabedian*, 433 Mass. at 368-371 (Sosman, J., dissenting). We find no support in this record for the contention that a reasonable survivor of abuse would be affected by such coverage in his ability to connect his symptoms to his abuse.

*Conclusion.* The judgment entered in favor of the defendant is vacated, and the matter is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[3]The facts of our case significantly depart from those of *Phinney* in other relevant ways. While we held there that the plaintiffs could not use their own affidavits and an expert's affidavit to contradict their own harmful admissions made during their depositions in order to defeat summary judgment, *Phinney* v. *Morgan*, 39 Mass. App. Ct. at 207, the record did not contain contemporaneous medical records and an affidavit by the victims' treating psychiatrist, as does the record before us.